IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TERRY BRETTNER,

    Plaintiff,

      v.

COLONIAL PIPELINE COMPANY,

    Defendant.

CIVIL ACTION FILE
NO. 1:06-CV-0764-TWT

## ORDER

This is an employment discrimination action brought under the Age Discrimination in Employment Act ("ADEA"). It is before the Court on the Defendant's Motion for Summary Judgment [Doc. 44] and Motion for Leave to Renew Its Motion for Summary Judgment [Doc. 61]. For the reasons set forth below, the Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part and its Motion for Leave to Renew is GRANTED.

## I. BACKGROUND

The Plaintiff, Terry Brettner, is a former employee of Defendant Colonial Pipeline Company. The Defendant is a Georgia corporation engaged in transporting and delivering gasoline, jet fuel, heating oil, and other refined petroleum products by pipeline to numerous locations in the southern and eastern United States. After early

retirement from Coca-Cola, the Plaintiff was hired by the Defendant in April 2001 to work as a Senior Project Manager ("PM") on the Defendant's Engineering Services Team in Alpharetta, Georgia.  He was 52 years old at the time. He was hired by Colonial Projects Team Leader Tom Cervino and Director of Engineering Josh Akan. As Senior PM, the Plaintiff was responsible for planning and overseeing specific projects and ensuring their successful completion according to an approved scope, budget and schedule.

During the first few years of his service in the company, the Plaintiff received excellent reviews for his performance.  In his 2001 evaluation, he earned a rating of "Achieves" or "Excels" in all categories and merited an overall rating of "Achieves."[1]

---

[1]The Defendant's rating system operates under the following rubric:

**Excels** - Results consistently exceeded performance objectives. Achieved breakthrough results through exceptional contributions.

**Achieves** - Met, and in many cases, exceeded some of key performance objectives.  Achieved quality results with high standards

**Meets Expectations** - Performance met objectives.  A solid contributor

**Needs Improvement** - The employee inconsistently met the job objectives. Specific areas of deficiencies[sic] in performance must be targeted for improvement and addressed.

**Unsatisfactory** - Overall, performance results did not meet the objectives, or the ability to improve performance against established objectives has not been demonstrated. A measurable development plan must be created and performance against the plan must be closely monitored and reviewed regularly to gauge progress.

(Ex. 5, at 7.)

He was also specifically praised for his ability to delegate authority.  Cervino stated: "Terry engaged the services of PCS to assist with project administration.  This was a change in course for typical Colonial project management.  The project manager typically assumed these responsibilities.  PCS has provided a valuable service, allowing Terry to leverage his time....He made a good decision to hire PCS to handle administrative duties."  (Ex. 5, at 3, 6.)

From 2001 until 2003, the Plaintiff was further commended for his oversight of Colonial's Project Management Manual–a book establishing a common process for use by all PM's in performing complex projects.  Cervino praised him for his teaching and mentoring skills, and he received a rating of "Achieves" for his work on this project in 2001.  His 2002 performance review evaluated him even more highly in this area, giving him a rating of "Excels" and commenting, "Colonial has made significant strides in developing our project management capabilities and much of that development is directly attributable to Terry.  Terry is an excellent teacher and continues to be Colonial's Project Management capability development leader." (Ex. 8, at 3.)

In August 2002, Cervino was replaced as Projects Team Leader by then 43 year old Richard Stewart.  At first, Stewart documented no problems with the Plaintiff's work.  Indeed, in the Plaintiff's 2002 performance evaluation, Stewart gave him a

rating of "Achieves" or "Excels" in every category but one, including an "Achieves" rating in the area of effective project management.  (Ex. 8.)  Stewart also initially approved of the Plaintiff's practice of delegating responsibility on his projects.  In an October 2003 periodic review, Stewart complimented the Plaintiff, stating "[y]ou are a good project manager and delegate well, which is usually the skill that Engineers need to learn so your example is beneficial."  (Ex. 12, at 2.)

The Plaintiff contends that his relationship with Stewart began to decline in late 2003, however, and that Stewart started treating him differently than the other PM's. Specifically, he alleges that Stewart gave non-project assignments to younger PM's, primarily Don Pozin and Nick DiQuollo, both of whom were under the age of 40.  He further claims that Stewart did not use his advice or counsel on project management, even when to do so would have been beneficial to the Defendant's business.  DiQuollo also observed that Stewart dealt with the Plaintiff differently than the other PM's, and stated that there was some discussion around the office that the Plaintiff was planning to retire as soon as he became eligible.

In his 2003 year-end performance review, however, Stewart gave the Plaintiff a rating of "Meets" or higher in every category.[2]  The review that the Plaintiff received

---

[2]These ratings matched the Plaintiff's own assessment of his performance in every category but one.  (Ex. 15.)

contained no criticism of the Plaintiff's effort level or his reliance on external project management resources.  In providing recommendations for development, Stewart suggested only that the Plaintiff "develop his knowledge of pipeline operations through field visits" and pursue his Project Management Professional ("PMP") certification.  (Ex. 15.)

Stewart contends, however, that by this time he had become concerned with the Plaintiff's management style.  Specifically, he claims that he discussed with the Plaintiff problems that he had observed with several of the Plaintiff's projects and that he had received complaints from members of the Plaintiff's team about his level of involvement.  Subsequently, on August 27, 2004, Stewart and a Colonial HR representative, Caron Cone, met with the Plaintiff, at which time Stewart informed him that he had observed significant performance issues that needed to be addressed. The Plaintiff was then given a "Needs Improvement" rating and a corresponding Performance Correction Notification ("PCN").  (Ex. 31.)  At that time, the Plaintiff was managing several projects for the Defendant, but the problems Stewart cited in the letter were associated only with the Defendant's performance on a project called Selma Expansion.  Stewart claimed that the Plaintiff had delegated too much responsibility on Selma and had failed to be responsive to project concerns in several key areas.  As a result of this PCN, Stewart determined that the Plaintiff should be

placed on a 60 day Performance Improvement Plan ("PIP") in order that he could show improvement in these areas of concern.

The Plaintiff alleges that during this meeting Cone told him, "Now I want you to go home over the weekend and decide if you want to continue to work for Colonial Pipeline, and we would be glad to help you transition if you decide to leave." (Brettner Dep. at 184.)  Also at this meeting, the Plaintiff complained for the first time that he was being discriminated against because of his age. He claimed that this action was taken against him in order to get the younger PM's, Pozin and DiQuollo, promoted into his job as Senior PM.   The Plaintiff based this conclusion on a conversation he had with DiQuollo approximately one week earlier, during which the Plaintiff claims that DiQuollo told him that Stewart was uncertain whether he could have more than one Senior PM.

After the 60 day PIP had expired, Stewart held a follow-up meeting with the Plaintiff on December 7, 2004, to discuss his progress on meeting these goals. Despite complimenting the Plaintiff on achieving some of the PIP's objectives, Stewart maintained that the PIP needed to be extended through March 31, 2005, to allow the Plaintiff to demonstrate improvement on short term projects.  Stewart claims that during the month following this meeting, however, he learned of several other incidents involving the Plaintiff that convinced him that the Plaintiff should be fired.

Included among these incidents were: (1) the Plaintiff's suggestion to Colonial CEO Dave Lemmon that the company contract with an outside engineering firm on the Ultra Low Sulfur Diesel ("ULSD") project; (2) project and accrual charges the Plaintiff had incorrectly assigned; and (3) failure to appropriately account for vacation on his time card.  (Stewart Aff. ¶ 24.)  Stewart also asserts that he observed problems with the Plaintiff's performance on two other projects, Sunrise Valley and Power Factor.  On March 3, 2005, the Plaintiff was fired by the Defendant.  His termination letter cited only the Defendant's "evolving business needs" as the reason for firing him.  (Ex. 57.)

After submitting his claim to the Equal Employment Opportunity Commission, the Plaintiff filed this lawsuit on March 31, 2006.  In it, he alleges that the Defendant violated his rights under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, by terminating his employment based both on his age and in retaliation for his complaint of age discrimination.  The Defendant has now moved for summary judgment on these claims.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).

## III. <u>DISCUSSION</u>

### A.  <u>Age Discrimination</u>

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  An employee bringing an ADEA claim can prove intentional discrimination by either of two methods: presenting direct evidence of discriminatory intent or through the four prong analysis established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981).  Because the Plaintiff concedes that he has no direct evidence of discrimination, he must make a prima facie showing that he: (1) is a member of a protected class; (2) was qualified for the

position; (3) suffered an adverse employment action; and (4) was replaced by a person outside the protected class.  Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002).  A plaintiff's prima facie case raises a presumption of illegal discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  The burden then shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the employment decision.  See McDonnell Douglas Corp., 411 U.S. at 802.  This intermediate burden is "exceedingly light."  Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997).

After the employer articulates such a reason, the plaintiff has the opportunity to demonstrate that this reason is merely a pretext for discrimination.  Pretext may be demonstrated either through additional evidence showing "the employer's proffered reason is unworthy of credence," Burdine, 450 U.S. at 256, or by relying solely on the same evidence that comprised the prima facie case.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  In reviewing the defendant's explanation, however, the Court cannot usurp an employer's legitimate business judgment in the absence of evidence of discrimination.  E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) ("in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court

of law"). Indeed, once a defendant proffers a nondiscriminatory and legitimate reason for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." Chapman, 229 F.3d at 1037; accord White v. Verizon South, Inc., 299 F. Supp. 2d 1235, 1241 (M.D. Ala. 2003). In other words, the plaintiff must be able to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

Here, it is undisputed that the Plaintiff has made a prima facie case under the ADEA. The Defendant concedes that Brettner is over forty years of age, was qualified for his position, was terminated, and was replaced by a younger PM. (Def.'s Mot. for Summ. J., at 28.) It is thus the Defendant's burden to proffer a legitimate, non-discriminatory reason for terminating the Plaintiff. In its motion for summary judgment, the Defendant offers two reasons: (1) the Plaintiff's failure to correct "problems attendant to and flowing from his 'hands off' management style"; and (2) the fact that the Defendant "decided to outsource the management of ULSD, largely because of its resulting lack of confidence in Plaintiff's ability." (Id., at 33.) The

Plaintiff has the burden of demonstrating that the Defendant's reasons for firing him were a pretext for discrimination. A plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005). Here, the Court finds that there is some evidence indicating that the Defendant's proffered reasons did not in fact motivate it to fire the Plaintiff.

Addressing first the Defendant's second explanation–lack of confidence in the Plaintiff's abilities to handle the ULSD project–the Court finds that this reason is simply unbelievable. First, this explanation was not proffered in the Defendant's position statement to the EEOC. It appeared for the first time in its summary judgment motion over two years after his termination. (Ex. 63.) More importantly, the Defendant has admitted that "the decision to outsource the ULSD project was not related to the Plaintiff's job performance." (Def.'s Admissions, ¶ 154.) The Defendant does nothing to explain this contradiction. Indeed, after the Plaintiff pointed out this admission in his opposition brief, the Defendant appears to retract its previous claim and assert in its reply that this second reason was in fact that "Colonial's need for Plaintiff's services greatly diminished after [Jerry] Martin

decided to use external project management resources for the ULSD project."[3] (Def.'s Reply to Resp. to Mot. for Summ. J., at 16.)  This is not the reason that the Defendant presented in its initial brief, and because the argument has been presented for the first time in a reply brief, it will not be considered.  See International Telecomms. Exchange Corp. v. MCI Telecomms. Corp., 892 F. Supp. 1520, 1531 (N.D. Ga. 1995); see also Zaccagnini v. Charles Levy Circulating Co., 338 F.3d 672,  678 (7th Cir. 2003) ("The fact that this explanation did not arise until CLCC's reply brief may be enough in and of itself to preclude summary judgment for CLCC on this issue, since a jury could reasonably find that its failure to come forward with this explanation earlier makes it not credible.").  The Plaintiff has thus sufficiently demonstrated that this reason cannot be believed.

The Court finds compelling evidence indicating that a concern for the Plaintiff's "hands off" style also did not motivate Stewart to fire Brettner.  First, the procedure through which Stewart notified the Plaintiff that a PIP was necessary indicates that this may have been a sham measure implemented merely to create negative documentation in the Plaintiff's employee file.  The Plaintiff concedes that at his 2003 review Stewart made verbal statements to him relating his concerns as to the

---

[3]Jerry Martin was Colonial's General Manager of Engineering Services.  He replaced Josh Akan in September 2004.

Plaintiff's lack of involvement, informing him that members of the Sunrise Valley project team had opined that Brettner delegated too much authority. (Brettner Dep. at 118-20, 125; Stewart Aff. ¶ 14.) However, the Plaintiff's periodic and yearly reviews in the months leading up to his PCN letter fail to provide any indication of poor performance. Indeed, the Plaintiff had never been cited on a performance evaluation as "needing improvement" in this area prior to that time and no evaluation had ever suggested that he work on developing this skill.[4] To the contrary, less than a year before his PCN notification, Stewart wrote, "You are a good project manager and delegate well, which is usually the skill that Engineers need to learn so your example is beneficial. Engineers tend to want to get themselves immersed in the details, which they cannot do if they wish to be effective project managers." (Ex. 12, at 2.)

---

[4]The Defendant has presented an unsigned "Maximizing Performance Worksheet" on the Plaintiff for 2003 that included several negative comments regarding the Plaintiff's over-delegation of project tasks. (Ex. 14.) The Plaintiff's attorney has affirmed that the Defendant did not include this document in its EEOC filings and presented it for the first time in response to discovery requests in August 2006. (Schwartz Decl., Ex. 5.) Stewart claims that he discussed these issues with the Plaintiff during the Plaintiff's 2003 review meeting, but cannot recall whether he gave him a copy. (Stewart Dep. at 377.) Oddly, the Plaintiff's actual performance review for 2003, which is signed by both him and Stewart, includes no negative comments. (Ex. 15.) The Plaintiff has stated that he never saw or received a copy of this document during this meeting. (Brettner Dep. at 94.) Furthermore, although Stewart contends that he regularly made notes on the Plaintiff and other PM's in preparation for their performance evaluations, (Stewart Aff. ¶ 11), the Defendant has failed to produce any examples of this other than Exhibit 14. This document is of dubious origin.

Although he also mentioned that the Plaintiff used more assistance on his projects than other PM's, he did not state that this was a negative, only that he had to justify it by giving the Plaintiff more projects than anyone else. (Id.)

The events that followed the PCN letter create further doubt as to the legitimacy of Stewart's concerns. He issued the letter based on the Plaintiff's management of one project, Selma, and the letter explicitly mentions no other past or present projects as causes for concern. (Ex. 31.) The problems cited in the letter include inadequate effort and preparation, delegation of authority to an inexperienced engineer, failure to participate sufficiently in the project's coordination and management, and failures in the project's execution planning. However, the Colonial employee who represented the Defendant's procurement department on Selma stated that he observed the Plaintiff's financial management capabilities and his overall management style and concluded that the Plaintiff had handled the project "flawlessly." (Yallech Decl. ¶¶ 2, 4, 9.)

When Stewart and the Plaintiff met in December 2004 to determine whether the PIP needed to be continued, moreover, Stewart conceded that he was not aware of any performance issues on any of the Plaintiff's remaining projects. (Stewart Dep. at 266, 288-89, 291.) Stewart maintained that an extension was necessary, however, in order to observe "sustained improvement" in the Plaintiff's follow-through in "ensuring that

project issues are resolved or are being adequately addressed either by yourself or your team members." (Ex. 37.)  Stewart thus extended the PIP through March 31, 2005, in order that the Plaintiff could "be assigned short-term projects that will provide you the opportunity to demonstrate improvement through as much of the project life cycle as possible." (Id.)  The Plaintiff claims that he knew Stewart had a tremendous backlog of projects and immediately asked for Stewart to assign him a few smaller ones pursuant to the PIP extension.   (Brettner Dep. at 236.) It is undisputed, however, that Stewart never assigned the Plaintiff any short-term projects. Stewart also claimed that he would meet with the Plaintiff at least every three weeks to review his progress, but held no subsequent meetings. (Brettner Dep. 235-36, 251; Def.'s Admissions, ¶ 221.)  When the Plaintiff was fired three months later, the only reason stated was "evolving business needs."[5]

Despite the letter's proffered explanation, the Defendant has since come forward with evidence of performance related issues that allegedly motivated Stewart to fire him after this meeting.  The Court finds that much of this evidence is of dubious credibility, however, because it either was not mentioned in a timely fashion or could not have been considered by Stewart at the time he made the decision to fire

---

[5]Although Stewart and Cone claim that Stewart also read a statement explaining that this firing was performance related, the Plaintiff denies this. (Stewart Dep. at 127; Cone Dep. at 129-30; Brettner Dep. at 260-61.)

the Plaintiff.  The Defendant first points to the Plaintiff's recommendation to Colonial CEO Lemmon at a December 2, 2004 meeting that the company immediately award the ULSD design contract to a vendor even though Colonial had not finished the project's preliminary design.   (Brettner Dep. at 239-241; Martin Aff. ¶ 10.) According to Jerry Martin, this proposal had been previously rejected at a team meeting and he was upset that the Plaintiff failed to disclose the team's conclusion when providing his opinion to the CEO.   (Martin Aff. ¶ 10.)   However, this recommendation occurred before the Plaintiff's PIP was extended and discussed with him on December 16, and Stewart provides no explanation as to why it took him until January 18, 2005, to write the Plaintiff a letter explaining his disapproval of this recommendation.  (Stewart Dep. at 335-36.)  Nor was this incident included as a reason for the Plaintiff's firing in his March 3, 2005 termination letter.  Stewart further contends that he was motivated to fire the Plaintiff because of Brettner's failure to report vacation days on his time sheet at the end of 2004.  (Stewart Dep. at 341-44.) He admits, however, that the Plaintiff corrected this error the same day.  (Id.)  This problem was widespread enough, moreover, to merit an email to Colonial's entire engineering department a month later asking employees to correct holiday vacation errors on their time sheets.  (Ex. 92.)

Although its position statement to the EEOC does not explicitly mention it, the Defendant also now contends that Stewart was motivated by the Plaintiff's similar problems with two projects other than Selma–Sunrise Valley and Gas Engine. (Def.'s Mot. for Summ. J., at 35.) The Defendant points out that the Plaintiff did not visit the Sunrise Valley project site until he was criticized by Stewart and the project finished over budget and had to be reopened after lingering problems were discovered. (Def.'s Mot. for Summ. J., at 35.) Stewart further stated that he had advised the Plaintiff that he was not providing information to team members of the Gas Engine project frequently enough and was not driving the project. There is no evidence, however, that either of these projects was even discussed at the August 27, 2004 meeting, and Stewart testified that he could identify no problems with the Plaintiff's performance on the Sunrise Valley project between this meeting and the December 7, 2004 follow-up. (Stewart Dep. at 288-89.) Moreover, the Plaintiff has shown that the additional costs associated with the Sunrise Valley project were the result of substantial amounts of additional rock hit during the drilling process that Stewart has admitted was not the fault of the Plaintiff. (Def.'s Admissions, ¶ 6, Attach. A; Stewart Dep. at 204.)

Some of Stewart's other claimed reasons for firing the Plaintiff, moreover, simply could not have motivated him because he did not discover them until after Brettner was already fired. See McKennon v. Nashville Banner Pub. Co., 513 U.S.

352, 360 (1995) ("The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason.").  For example, the Defendant claims in its summary judgment motion that a leak occurred on the Selma site that Plaintiff allowed others to correct instead of taking responsibility himself. (Def.'s Mot. for Summ. J., at 34.) Stewart states, however, that he learned of this leak only shortly before the Plaintiff was terminated and did not learn until later that the Plaintiff had "failed to take appropriate efforts to resolve the problem."  (Stewart Aff. ¶ 34.)  This indicates that this information was not available to Stewart at the time he decided to fire the Plaintiff.  In its motion for summary judgment, the Defendant also claims that Sunrise Valley ultimately finished over budget because of lingering problems discovered after the Plaintiff's termination.  (Def.'s Mot. for Summ. J., at 35.)  Again, even if these issues were in fact the Plaintiff's fault, they could not have affected the Defendant's decision to fire him.

The Court also finds that the Defendant's explanation for firing him has shifted over time, further suggesting a discriminatory motive.  See Howard v. BP Oil Co., Inc., 32 F.3d 520, 526 (11th Cir. 1994) (holding that a defendant's inconsistent statements can provide evidence of pretext); see also Kobrin v. University of Minnesota, 34 F.3d 698, 703 (8th Cir. 1994) ("Substantial changes over time in the

employer's proffered reason for its employment decision support a finding of pretext."); <u>Bhatia v. AT & T, Inc.</u>, 310 F. Supp. 2d 29, 32 (D. D.C. 2004) (finding that a genuine issue of pretext existed where the plaintiff presented evidence that his employer was "waffling" between two reasons for his termination). The Defendant asserts, however, that it has only elaborated on its previously stated reasons for firing the Plaintiff. <u>See</u> <u>Hoard v. Cuh2a, Inc. Architecture Engineering Planning</u>, 2006 WL 2617130, at *1 (N.D. Ga. 2006) (holding that an employer's statement that the plaintiff had "resigned" to be consistent with its later explanation of its legitimate non-discriminatory reasons for forcing this resignation); <u>Wisdom v. M.A. Hanna Co.</u>, 978 F. Supp. 1471 (N.D. Ga. 1997) (finding differing reasons for a termination provided by two supervisors not to be inherently inconsistent because both were valid reasons and were not mutually exclusive). Unlike these cases, in which courts found that the employer's explanations were not materially inconsistent with one another, the Defendant's reasons for its decision demonstrate at least one serious conflict that cannot be sufficiently explained. As previously discussed, the second reason provided in the Defendant's summary judgment motion–lack of confidence in the Plaintiff's ability to handle the ULSD project–has shifted even since the briefing of this motion began. There is further evidence that the Defendant is continuing to produce new, and often untenable reasons, as its previous ones are exposed to scrutiny. For example,

in the Plaintiff's termination letter in March 2005, the Defendant claimed that he was being fired because of changing business needs and made no mention of the PIP or any other performance related concerns.   In its June 27, 2005 EEOC position statement, the Defendant then cited "the specific performance issues that arose in December" as well as "his overall failure to show marked improvement in his performance."   (Ex. 63, at 7.)   At summary judgment, filed March 9, 2007, the Defendant mentioned for the first time the Plaintiff's problems with the Sunrise Valley and Gas Engine projects and its lack of confidence in his ability to handle the ULSD.   New reasons, at least one of which is entirely inconsistent with the Defendant's admissions, have thus continued to filter out over the intervening months since the Plaintiff's firing.   Given that only one supervisor made the termination decision, a genuine issue exists here as to whether Stewart's later explanations constitute not an "elaboration" of previously stated reasons, but rather the "evolution" of a theory molded to comply with facts already in the record.

The record suggests, finally, that Stewart had begun to treat the Plaintiff differently than his younger counterparts in the months leading up to his PIP and ultimate termination.   DiQuollo testified as to several instances where Stewart was "hard on Terry" in staff meetings and treated him differently than the other PM's. (DiQuollo Dep. at 88-90.)  Moreover, despite the fact Stewart explicitly recommended

that the Plaintiff pursue his PMP certification and knew that the Plaintiff had done so, he never gave the Plaintiff his $500 award or publicly acknowledged him for this achievement, as he had with other PM's.  (Brettner Dep. at 230; Stewart Dep. at 327-29; Def.'s Admissions, ¶ 29.)  Stewart claims that he chose not to give the Plaintiff this award while he was on a PIP.  He admits, however,  that after the Plaintiff told him that he had received his certificate, Stewart never informed him that he was not eligible for the award.  (Stewart Dep. at 327-28.)  Both Brettner and DiQuollo further testified that Stewart had put the notation "CPC Cares Award for Terry" on a "to do" list on the white board in his office and that it remained there through the end of 2004.  (DiQuollo Dep. at 84; Brettner Dep. at 228.)          The Plaintiff also points out that he was given less favorable reviews than a  younger PM, Nick DiQuollo, despite similar performance.  Specifically, one of DiQuollo's projects, Roanoke, was like the Plaintiff's Selma project in that it involved the installation of variable frequency drives and faced concerns such as lack of resources. (Def.'s Admissions, ¶ 139.)  Despite the fact that Selma ultimately received an 80% rating and Roanoke one of only 60% in 2004, Stewart gave DiQuollo an overall rating of "Achieves" for his work on this project, nominated him for a Presidential Award, and recommended him for promotion.  (Def.'s Admissions, ¶ 143.)  Indeed, the testimony demonstrates that Stewart had originally rated Roanoke at an 80% achievement level and Selma's at

60%, but that these ratings were later reversed.  (Brettner Dep. at 129, 155; Stewart Dep. at 360; Ex. 29.)  Despite the fact that the Defendant cites Selma's scheduling and cost difficulties as reasons for the Plaintiff's termination, moreover, the Defendant admits that Roanoke similarly ran about 10% over its original AFE and was four months late.  (Def.'s Admissions, ¶¶ 138, 139.)  The Roanoke project, unlike Selma, was in fact unable to deliver on time and had to be kept open.  (DiQuollo Dep. at 65-66.)  The Defendant has provided nothing to explain why Stewart rated DiQuollo's performance so differently in light of this evidence.

The Defendant argues that summary judgment is warranted, however, because of the lack of evidence of age discrimination presented by the Plaintiff in this case. The Court agrees that there is little support for the Plaintiff's allegation that Stewart was limited in the number of Senior PM's he could hire and thus needed to get rid of the Plaintiff to promote others.  DiQuollo, to whom the Plaintiff attributes the statement regarding a limitation on Senior PM's, acknowledges that a conversation took place between him and the Plaintiff on this topic, but does not recall whether anything was said about a limit on Senior PM's.  (DiQuollo Dep. at 72.)  The Plaintiff offers nothing but his own testimony to support his claim, which several of Colonial's employees have firmly denied.  (Stewart Aff. ¶ 28; Martin Aff. ¶ 11; Cone Dep. at 85.) The Plaintiff also fails to provide any evidence that Stewart has ever exhibited

discriminatory animus towards the Plaintiff or any other older employee.  The most he can offer is one innocuous question Stewart allegedly asked him about his retirement after seeing a magazine on the Plaintiff's desk entitled "Where to Retire." (Brettner Dep. at 193.)[6]

The Court finds, however, that the Plaintiff has submitted enough evidence to raise genuine doubt as to the legitimacy of his employer's motive.  See Davenport v. Riverview Gardens School Dist., 30 F.3d 940, 946 n.8 (8th Cir. 1994) (holding that, to survive summary judgment, a plaintiff is required only to "adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence did not directly contradict or disprove defendant's articulated reasons for its actions").  In making this determination, the Court is guided

---

[6]The Defendant also argues that age discrimination cannot be inferred here because the Plaintiff was hired at age 52 and originally given good reviews by Stewart, and it is unreasonable to think that this "same actor" could have developed an age based bias over the next 18 months.  See Williams v. Vitro Services Corp., 144 F.3d 1438, 1443 (11th Cir. 1998) (explaining that where the same actor hires and fires the employee, the jury can draw an inference that the firing was not discriminatory). The Plaintiff contends, however, that the difference in Stewart's treatment of him began around the same time that Akan, the Director of Engineering and an individual in his 60's, departed in December 2003.  (Pl.s' Resp. to Mot. for Summ. J., at 38 n.10.) Because the Plaintiff was not hired by Stewart, moreover, this "same actor" inference cannot be drawn in the present case.  Furthermore, the same actor inference is one that a jury may make at trial and is not appropriate at summary judgment.  Williams, 144 F.3d at 1443 ("[I]t is the province of the jury rather than the court, however, to determine whether the inference generated by 'same actor' evidence is strong enough to outweigh a plaintiff's evidence of pretext.").

by the Supreme Court's decision in <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530

U.S. 133 (2000), which held that:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

<u>Id.</u> at 147-48 (internal citations omitted); <u>see also</u> <u>St. Mary's Honor Center v. Hicks</u>,

509 U.S. 502, 511 (1993) (holding that, in an appropriate case, "[t]he factfinder's

disbelief of the reasons put forward by the defendant (particularly if disbelief is

accompanied by a suspicion of mendacity) may, together with the elements of the

prima facie case, suffice to show intentional discrimination").  The Court concludes

that the Defendant's differing and sometimes contradictory reasons for this firing

indicate a degree of untruthfulness that, when viewed in the light most favorable to

the Plaintiff, demonstrate a genuine issue of pretext.  A reasonable jury could

conclude that the Plaintiff's "hands off" management style was a reason concocted by

Stewart to hide a discriminatory motivation for his termination.  Accordingly,

summary judgment on this motion is inappropriate.

    B. <u>Retaliation</u>

The Plaintiff's Complaint also includes an allegation of retaliation. (Compl., ¶ 56.)   In his opposition brief, he contends that because the Defendant failed specifically to move for summary judgment on this claim, it automatically survives the motion.  He further contends that even if the Defendant had properly moved for summary judgment, he has demonstrated a prima facie case on this claim.  The Defendant has made a Motion for Leave to Renew its Motion for Summary Judgment to include consideration of this retaliation claim.  In the interest of judicial economy and because the Plaintiff has had the opportunity to brief the Court on this issue, the Court grants the Defendant's motion and will consider the retaliation claim as part of its motion for summary judgment.

To prove retaliation, a plaintiff must demonstrate that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between these two events.  Stavropoulos v. Firestone, 361 F.3d 610, 616 (11th Cir. 2004).  In order to show a causal link, "mere temporal proximity between knowledge of protected activity and an adverse action must be 'very close.'" Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (punctuation omitted) (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)). Indeed, the Supreme Court has cited with approval decisions in which a three or four month delay were found to be insufficient to show a causal connection.  See Breeden, 532 U.S. at

273 (citing Richmond v. ONEOK, 120 F.3d 205, 209 (10th Cir.1997) and Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992)); accord Higdon, 393 F.3d at 1220. The Eleventh Circuit has further made clear that, in the absence of other evidence of retaliation, a substantial delay between the protected expression and the adverse action renders the claim insufficient as a matter of law. Higdon, 393 F.3d at 1220 (citing Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001) (finding no triable issue of retaliation where the plaintiff had engaged in a protected activity and was fired four months later)). Here, the Plaintiff's only proffered evidence of a causal link between his allegation of age discrimination and his termination is the fact that the two events occurred within six months of each other. This is clearly insufficient to create a triable issue and summary judgment on this claim is warranted.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment [Doc. 44] is GRANTED in part and DENIED in part and its Motion for Leave to Renew Its Motion for Summary Judgment [Doc. 61] is GRANTED.

SO ORDERED, this 13 day of July, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge